IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

REHAN A. RANA,                              )
                                            )
              Petitioner,                   )
                                            )
       v.                                   )       Case No.  4:20-cv-00194-AGF
                                            )
UNITED STATES OF AMERICA,                   )
                                            )
              Respondent.                   )

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Rehan A. Rana's motion filed under

28 U.S.C. § 2255 to vacate, set aside, or correct his sentence in Case No. 4:17-cr-00297-

AGF-8 ("health care fraud case").  On September 18, 2018, Petitioner entered a plea of

guilty to Count 1 of the health care fraud case.  Count 1 charged Petitioner and others

with conspiring to violate the Anti-Kickback Statute in violation of 42 U.S.C. §§ 1320a-

7b(b)(1) and 2; to execute a scheme to defraud a health care benefit program, in violation

of 18 U.S.C. § 1347(a); and to make false statements in a matter within the jurisdiction of

a federal agency, in violation of 18 U.S.C. § 1001, all in violation of 18 U.S.C. § 371.

The same day, Petitioner waived indictment and pleaded guilty to Count 1 in Case No.

4:18-cr-00770-AGF-1 ("tax fraud case"), submitting a false federal tax return in violation

of 26 U.S.C. § 7206(1).[1]  The Court accepted Petitioner's pleas, and on August 16, 2019,

---

[1]      Petitioner has filed a separate habeas petition related to Case No. 4:18-cr-00770-
AGF-1 alleging prosecutorial misconduct.  *See Rana v. U.S.*, Case No. 4:20-cv-01092.

sentenced Petitioner to 24 months in prison on Count 1 of the health care fraud case, and 24 months in prison on Count 1 of the tax fraud case, the sentences to run concurrently. Petitioner was released from prison on January 14, 2022, and is currently serving his three-year term of supervised release.

In his § 2255 motion, Petitioner asserts claims of prosecutorial misconduct and ineffective assistance of counsel related to a transcript of a recorded conversation between Petitioner and his co-conspirators that erroneously transcribed one word. Petitioner claims that a member of the prosecutorial team, Special Agent Stacey Jordan, doctored the transcript of the conversation in order incriminate Petitioner,[2] and that his attorneys were ineffective in their failure to detect the transcript error and their failure to provide Petitioner with the audio recording of the conversations.  Petitioner claims that, but for this government misconduct and his attorneys' deficient performance, he would not have pleaded guilty and instead would have proceeded to trial.  In other words, Petitioner claims that had he known about the error in that single sentence of the transcript, he would not have pleaded guilty.

On March 15, 2023, the Court held an evidentiary hearing.  Petitioner was represented by his retained counsel, John Markham, at the evidentiary hearing. Following the hearing, both parties submitted supplemental briefs in support of their arguments.  *See* Doc. Nos. 31-32.  Based on the entire record, and having the opportunity

---

[2]      As discussed below, in his post-hearing brief, Petitioner has abandoned the claim of prosecutorial misconduct.  Doc. No. 32 at 6, n.2.

to observe and evaluate the demeanor of the witnesses at the hearing, Petitioner's motion will be denied.

## BACKGROUND

**Criminal Proceedings**

As a part of the guilty plea agreement signed by both parties, Petitioner stipulated to the following facts. *United States v. Camillo et al.*, Case No. 4:17-cr-00297-AGF-8, Guilty Plea Agreement, Doc. No. 429.[3]

At all relevant times, Petitioner owned or was involved in a number of businesses that provided health care services to Medicare and Medicaid patients, including the focus of the indictment, Allegiance Medical Services LTD and Allegiance Medical Services LCC (collectively, "Allegiance"). Petitioner was active in the management of Allegiance and solicited funds on Allegiance's behalf. From approximately 2009 to 2012, in the Eastern District of Missouri and elsewhere, Petitioner and his co-conspirators participated in a conspiracy to defraud and commit offenses against the United States for the purposes of: (1) concealing Azeem Meo's illegal involvement and participation in Allegiance, despite knowledge of Azeem Meo's lawful exclusion from participating in any capacity in Medicare and Medicaid programs; (2) soliciting, offering, paying, and receiving kickbacks for referring, arranging for, and recommending that specimens be sent to Allegiance; (3) receiving Medicare and Medicaid reimbursement for testing specimens that where obtained in exchange for illegal remunerations; and (4) receiving and

---

[3] References to the underlying health care fraud case are designated as "Crim. Doc. No. ___").

distributing financial proceeds from the conspiracy.

Regarding the kick-back scheme, to increase the number of referrals to Allegiance, Petitioner's co-conspirators entered into contracts among themselves and with other individuals and businesses, referred to as marketers, and agreed to pay, and did pay, for specimens referred or sent to Allegiance for testing.  In addition to marketers, Petitioner's co-conspirators offered and paid medical doctors for the referrals that the doctors made to Allegiance.  "Rana was aware that his co-conspirators were paying doctors, including un-indicted co-conspirator Dr. B.V.,[4] to refer specimens to Allegiance and knew that such payments were illegal."  Crim. Doc. No. 429 ¶ ff.  During a recorded conversation in or after July 2012,[5] Petitioner and co-conspirators Camillo, Azeem Meo, and Kazeem Meo discussed the business of Allegiance and these payments to doctors.

> During the recorded conversation, Camillo stated: "You'd still have to pay Dr. B." Camillo also stated: "Let's get away from paying on each specimen and let's just pay on specimens we actually get or that we collect on." He further stated: "[W]e still have commission to the guy who brought it [specimen] to us."

*Id.* ¶ hh.  Petitioner and co-conspirators illegally submitted reimbursement claims to Medicare and Medicaid for tests performed on the specimens procured by illegal kickbacks.  *Id.* at ¶ jj.

---

[4]     Dr. B.V. refers to Dr. Vaid.

[5]     The parties agree the sole recorded conversation in question occurred specifically on August 22, 2012.  *See* Doc. No. 1-2 ¶¶ 14-15; Doc. No. 9 at 6.  The recording was secretly made by co-defendant Camillo, who later sent the recording to investigators.

Petitioner and nine co-defendants were indicted in the health care fraud case on July 5, 2017.  Crim. Doc. No. 3.  On July 24, 2018, the Court granted in part the severance motions of Petitioner and co-defendants, ordering that Petitioner, Dr. Golding, and Kazim Meo be tried together on Counts 1-6 of the indictment.[6]  Crim. Doc. No. 390 at 9.  In support of the portion of Count 1 of the indictment that alleged conspiracy to violate the Anti-Kickback Statute, the indictment alleged, *inter alia*, that Petitioner and co-defendants paid illegal kickbacks to two classes of recipients: marketers and medical doctors.  Crim. Doc. No. 3.  Regarding illegal payments to doctors, the indictment alleged the following:

> It was further part of the conspiracy that the defendants offered and paid doctors, directly or through their business, for referrals that the doctors made to Allegiance.
>
> * * *
>
> It was further part of the conspiracy that the defendants paid un-indicted co-conspirator Dr. B.V. for each blood and urine specimen that he referred to Allegiance.
>
> In or after July 2012, defendants Camillo, Rehan Rana, Kazim Meo, and un-indicted co-conspirator Azeem Meo met and discussed, among other things, payments that they were making to doctors for referrals. This conversation was recorded.
>
> During the recorded conversation, Camillo stated: "You'd still have to pay Dr. B." Camillo also stated: "Let's get away from paying on each specimen and let's just pay on specimens we actually get or that we collect on." He further stated: "[W]e still have commission to the guy who brought it [specimen] to us."

*Id.* ¶¶ 44, 46-48.

---

[6]     Co-Defendant, Anthony Camillo, also named in Count I, pleaded guilty to Counts 1, 7, and 28 on March 26, 2018.  Crim. Doc. No. 326.

<u>Plea Agreement and Hearing</u>

As indicated above, on September 18, 2018, pursuant to a written plea agreement, Petitioner pleaded guilty to Count 1 of the health care fraud case, Crim. Doc. No. 429, and at the same hearing waived indictment and pleaded guilty to Count 1 of the tax fraud case, *United States v. Rana*, 4:18-cr-00770-AGF-1, Guilty Plea Agreement, Doc. No. 6.

In exchange for Petitioner's plea of guilty to Count 1 of the health care fraud case and his further waiver of indictment and plea of guilty to Count 1 of the tax fraud case, the Government agreed to dismiss Counts 3-6 of the health care fraud case at sentencing.[7] Crim. Doc. No. 429 at 1.  Additionally, the Government promised that no further federal criminal prosecution would be brought against Petitioner for (1) soliciting, offering, giving, or receiving illegal kickbacks in exchange for referrals to health care providers the Petitioner either owned or invested in, including not only Allegiance, but also specifically, American Toxicology Institute, Alpha Analytical, Inc., St. Louis Hills Pharmacy, Inc., and Imran Pharmacy, Inc., and (2) submitting or causing the submission of false and fraudulent reimbursement claims for patients, specimens, and tests obtained as a result of illegal kickbacks paid by the above named health care providers.  *Id.* at 1-2. The Government further agreed to recommend a two-level reduction in Petitioner's

---

[7]     In his supplemental § 2255 brief filed after the evidentiary hearing, Petitioner incorrectly asserts that Petitioner was only changed in Counts 3-6, when in fact Petitioner was charged with Count 1 and pleaded guilty to Count 1.  Crim. Doc. No. 3 at 7.  Count 1 charged Petitioner with a conspiracy to defraud the United States.  Crucially, this conspiracy was not limited to kickbacks, but also charged Petitioner with his involvement in the conspiracy to conceal Azeem Meo's illegal involvement and participation in Allegiance.  *Id.* 7-8.  Counts 3-6 were dismissed at sentencing.

offense level for acceptance of responsibility and agreed to recommend the consolidation of the health care fraud and tax fraud cases for sentencing.  Crim. Doc. No. 429 at 2.

At the change-of-plea hearing on September 18, 2018, Petitioner represented to the Court under oath that he had fully discussed the charges and case with his attorney, John Rogers.  Crim. Doc. No. 1001, Plea Hr'g Tr., at 15.

> THE COURT: And has he [Attorney Rogers] reviewed with you the evidence that the Government has against you in this case?
>
> THE DEFENDANT: Yes, Your Honor.

*Id.*  Petitioner further affirmed that he was satisfied with the representation he received from his attorney, and that he had enough time to discuss the case and plea agreement with his attorney.  *Id.* at 16-17.

> THE COURT: Is there anything you think your attorney should have done but has not done in representing you?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: Is there anything that you asked your attorney to do that he failed or refused to do?
>
> THE DEFENDANT: No, Your Honor.

*Id.* at 17.  The Court ascertained the factual basis for the guilty plea, and Petitioner represented that he was guilty of the charges to which he was pleading.  *Id.* at 33-35.

> THE COURT: Did you in fact enter into an agreement or understanding with Anthony Camillo and others with respect to the operation of Allegiance Medical Services at some point during the time period from 2009 through 2012?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: And in connection with that did you solicit funds and assist with the management of Allegiance?

THE DEFENDANT: Yes, Your Honor.

THE COURT: At some point during that conspiracy did you become aware of the fact that Azeem Meo had been excluded from participating in these government programs?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you in fact continue to assist Allegiance knowing that Azeem Meo was participating in the programs through Allegiance?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And among the objects of that conspiracy or agreement, did they include concealing Azeem Meo's illegal involvement and participation in Allegiance?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Were you aware that in fact Allegiance was also involved in the solicitation of and receipt and payment of illegal kickbacks for referring or arranging for or recommending that specimens be sent to Allegiance?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And did you understand and know that reimbursement through Medicare and Medicaid would be sought in connection with those specimens that had been obtained through payment or receipt of illegal kickbacks?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And were you aware that payments were in fact being made to doctors and marketers one purpose of which was to induce referrals?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you aware that numerous acts were taken in order to achieve the objects of this conspiracy and carry forward that conspiracy including numerous meetings, emails, and bank transfers?

THE DEFENDANT: Yes, Your Honor.

*Id.* Petitioner acknowledged that by accepting the plea agreement he waived all rights to appeal all non-jurisdictional, non-sentencing issues, as well as all rights to contest either

his conviction or sentence in any post-conviction proceeding except for claims of prosecutorial misconduct and ineffective assistance of counsel pursuant to 28 U.S.C. § 2255.  *Id.* at 48, 50.

The Court found Petitioner's plea to be knowing, intelligent, and voluntary, and to have "a basis in fact that contains all of the elements of the offense charged in Count One of the indictment," and accordingly accepted Petitioner's guilty plea.  *Id.* at 54-55.

Sentencing Proceedings

Petitioner filed a Supplemental Sentencing Memorandum on August 13, 2018, in order to minimize a protracted sentencing hearing.  Crim. Doc. No. 852.  In the supplement, regarding payments to marketers and doctors, Petitioner affirmed the following (collectively, "Government's 404(b) evidence"):

> Rana owned 75% of St. Louis Hills Pharmacy. . . St. Louis Hills Pharmacy paid marketers 25 percentage of the profits received by the pharmacy for compound prescriptions, filled at the pharmacy. These payments were made to marketers between 2013 to in or about 2017. At some point, Rana became aware that marketers were paying doctors monies for referrals of business.

*Id.* at 1-2.

> Rana opened American Toxicology Institute ("ATI"), a medical testing lab in or about January, 2013, which was shortly after Allegiance closed in late 2012. Rana was the sole organizer. Rana paid or caused payments to be made to marketers to induce them to refer business to ATI.

*Id.* at 3.

> Rana paid the girlfriend of Dr. [Stanley] Librach[, M.D.] about $22,000, over an approximate four month period in 2015, to provide "marketing services." Dr. Librach asked Rana if he can hire his girlfriend. Rana routed the payments to the girlfriend through Vision Marketing Group. Rana's motivation in hiring Librach's girlfriend was to maintain Dr. Librach's business from American Pain Institute, which was referring compound scripts and specimens to ATI.

- 9 -

*Id.*

> Dr. [Brij R.] Vaid, M.D. had his own practice and operated out of several offices. Rana, thorough his company ATI, paid St. Louis Internal Medicine by reimbursing St. Louis Internal Medicine (Dr. Vaid['s] practice name) for ATI's 3 employees, whom ATI inherited from a previous lab, used by St. Louis Internal Medicine (Physician Choice Laboratories). Their duties were to collect specimens and to get the specimens to the lab for analysis, in part to induce Dr. Vaid to refer specimens to ATI for analysis.

*Id.* at 3-4.

As set forth in the Amended Final Presentence Report ("PSR"), the two cases were grouped together for purposes of the sentencing guidelines calculations, which resulted in a total offense level of 19, a criminal history category of I, and a sentencing guideline range of  30 to 37 months.  Crim. Doc. No. 857 ¶¶ 125-126.  On August 16, 2019, Petitioner was sentenced to a term of imprisonment of 24 months on Count 1 of the health care fraud case and a term of imprisonment of 24 months on Count 1 of the tax fraud case, the two terms to run concurrently, and a term of three years of supervised release.  Crim. Doc. No. 889 at 54-55.  Petitioner was ordered to pay restitution in the amount of $526,285.37,[8] and a fine in the amount of $80,000.  *Id.* at 55-57.  Pursuant to 21 U.S.C. § 853, Petitioner additionally forfeited all right, title, and interest in the property identified in the Order of Forfeiture of December 20, 2018.  *Id.* at 64.  The Court further ordered Counts 3-6 of the health care fraud case dismissed on motion of the Government and pursuant to the terms of the plea agreement.  *Id.* at 62-63.  Defendant was ordered to surrender himself to the USMS to begin his sentence on February 15,

---

[8]    This restitution obligation was joint and several with co-defendants Anthony Camillo, Azeem Meo, and Dr. Devon Golding.

2020.  *Id.* at 65.  The Court subsequently granted Petitioner's multiple requests to delay his reporting date, and Petitioner ultimately reported to the Bureau of Prisons on August 24, 2020.  Crim. Doc. Nos. 923, 929, 934, 945.  Petitioner was released from prison on January 14, 2022, and is currently on supervised release.

**Motion to Vacate**

On February 4, 2020, Petitioner filed this motion under 28 U.S.C. § 2255 to vacate his guilty plea and sentence as to Count 1 of the health care fraud case and for a stay of his prison reporting date.  Doc. No. 1.[9]

In his § 2255 motion, Petitioner asserts grounds to vacate his conviction and sentence on the basis of prosecutorial misconduct and ineffective assistance of counsel. Central to both claims is an alleged discrepancy between (1) the language discernable in a recording of a conversation[10] between Petitioner and his co-conspirators on or about August 22, 2012, and (2) an initial transcript[11] of that recording provided by the

---

[9]     In Petitioner's consent motion of April 3, 2020, he indicated his intent to amend his § 2255 motion to additionally request re-sentencing in the tax fraud case.  Doc. No. 7. In the Court's order of April 10, 2020, the Court stated: "should Petitioner wish to challenge his sentence in 4:18−CR−770, he must do so in a separate action."  Doc. No. 8. The Court granted a brief stay of the reporting date, but declined to stay the reporting date until after determination of his § 2255 motion.  *Id.*

[10]     The recorded conversation in question is referenced in paragraphs 47 and 48 of the indictment (Crim. Doc. No. 3) and paragraphs gg and hh of the plea agreement.  Crim. Doc. No. 429.  It is undisputed that a second transcript of the recording was made by the agent which corrected the language on which Petitioner relies.

[11]     Petitioner's Exhibit A is the transcript Petitioner purports to have received in discovery and relied upon in deciding to plead.  Doc. No. 1-2 at 16.  At the evidentiary hearing, Petitioner moved to admit Exhibit A, the Moriarty Transcript, with handwritten annotations by Petitioner.  The Court received the transcript as Petitioner's Exhibit A, but

- 11 -

Government in discovery.  Petitioner contends he relied on the inaccurate transcript when deciding to plead guilty because he was not given access to the recording and could not adequately remember what was then a five-year-old conversation.  Doc. No. 1 at 2. Petitioner asserts he "pleaded guilty because of the implication of that transcript," in particular the implication of the allegedly altered line, which he understood to be evidence that Petitioner participated in a discussion about making illegal payments to Dr. Vaid, a referring physician.  Doc. No. 1-2 ¶ 16.

Prosecutorial Misconduct Claim

In his motion, Petitioner asserted a claim of prosecutorial misconduct, limited in scope to the conduct of Special Agent Stacey Jordan, who was at all relevant times a member of the prosecution team in the health care fraud case.[12]  Petitioner alleged that Special Agent Jordan "doctored a transcript" of the above-mentioned conversation, upon which Petitioner relied, "to falsely show that Rana had participated in a meeting during which he and his co-conspirators discussed and agreed to pay illegal kickbacks to doctors and others."  Doc. No. 10 at 2.  Specifically, Petitioner contended that she replaced the name "Dr. Bond" in the recorded conversation (ostensibly Dr. Laurence Bond, Allegiance's medical director, to whom payments would have been legal), with "Dr. Vade" in a specific paragraph of the transcript.  Doc. No. 1-1 at 5-6.

---

Petitioner did not testify with respect to any of the annotations and the Court noted on the record that any annotations therein would not be relied upon.  Doc. No. 30 at 22.

[12]     Petitioner conceded, "[t]here is no indication at all nor any intent to assert that the federal prosecutor had any knowledge of this matter, only the case agent."  Doc. No. 1-1 at 9, n. 2.

> SPEAKER 1 (Anthony Camillo): Well, you know, my point is that when we looked at it, it's real easy to start taking people and say put them here, put them here.  But the bottom line is, if you close the blood lab, who would you lay off?  Right now we would lay off three people, ok?  Not seven people.  We wouldn't have to pay rent. You'd still have to pay rent.  **You'd still have to pay Dr. Vade**.  You'd still have to – I'm just talking about all the expenses.  You'd still have all those expenses . . ."

Doc. No. 1-2 at  38-39 (emphasis added).

Petitioner asserted that he understood "Dr. Vade" to be Dr. Brij Vaid, a referring physician who was referenced in the stipulation to the Government's 404(b) evidence, and who Petitioner understood to also be "Dr. B.V." as appearing in indictment paragraph 46 and "Dr. B." as appearing in indictment paragraph 48.  Doc. No. 1-1 at 3-4; Doc. No. 1-2 ¶ 18.  Petitioner also asserted that Special Agent Jordan "tried to intimidate Jennell Johnson, a potential witness, into giving false incriminating information against [Petitioner], further showing that agent's willingness to create inculpatory facts where they did not exist. . . ."  Doc. No. 10 at 3.

While not conceding that the alleged misconduct by Special Agent Jordan could be considered prosecutorial misconduct for which § 2255 gives a remedy, the Government contends that Petitioner's claim has no factual basis.  Doc. No. 9 at 26.  The Government also denies that Special Agent Jordan ever solicited incriminating testimony from Jennell Johnson in the manner alleged and argues that Johnson's characterization of Special Agent Jordan's questioning as angry, annoyed, harassing, etc., does not transform lawful questioning into prosecutorial misconduct for which § 2255 provides a remedy. *Id.*

- 13 -

In his supplemental § 2255 brief, filed after the evidentiary hearing, Petitioner now admits there was no misconduct on the part of the case agent.  Doc. No. 32 at 6. Moreover, as the Respondent notes in its post-hearing brief, Petitioner presented no testimony or argument related to Jennell Johnson.  In his post-hearing brief, Petitioner limits his claim to the alleged ineffective assistance of counsel related to the transcript.

<u>Ineffective Assistance of Counsel Claims</u>

Petitioner's claims of ineffective assistance of counsel are premised entirely upon the above-mentioned alleged transcript discrepancy.  The evidence is undisputed that there were two transcripts of the recorded conversation prepared and provided in discovery prior to Petitioner's plea, the first created by Moriarty Reporting & Video, LLC, which erroneously transcribed the reference as "Dr. Vade" ("Moriarty Transcript" and Petitioner's Exhibit A), the second, a version of the Moriarty Transcript which Special Agent Jordan independently reviewed in comparison to the recording, titled "Transcription Camillo Audio – SA Jordan Addition to Moriarty" ("Jordan Transcript"). *Id.* at 7-8.  The Jordan Transcript amended the original Moriarty Transcript to replace "Dr. Vade" with "Dr. Bond" in the paragraph at issue.  *Id.*; Doc. No. 9-1 at 24.  The evidence establishes that by July 12, 2018, two months before his plea hearing, Petitioner's attorneys had received both transcripts and the audio recordings of the conversation in question.  Doc. No. 9 at 8-9.

Petitioner asserts his attorneys failed to detect the transcript error, and that "he was not given the opportunity to review the audio recording of the meeting" in order to detect it himself before his change-of-plea hearing.  Doc. 10 at 2.  Petitioner argues that but for

his attorneys' deficient performance, he would not have pleaded guilty and would have instead proceeded to trial.  Doc. No. 1-1 at 8.

In its opposition, the Government argues that Petitioner has failed to demonstrate deficient performance by his attorneys or that he suffered any prejudice as a result.  The Government submits the affidavits of Petitioner's attorneys, John Rogers and David Mueller, in support of its argument that in the course of their representation, plea counsel compared audio recordings of the August 22, 2012 conversation in question to at least one transcript.  Petitioner's attorneys claim that they discussed the potential discrepancies in the transcript, the admissibility, and the weight of such evidence with Petitioner prior to his plea.  Doc. No. 9 at 15-16; Doc. No. 9-3, David Mueller Aff., at 1.

The Government further argues that Petitioner failed to demonstrate prejudice because there was no deficient performance of counsel to be prejudiced by.  However, even if counsel's performance were found deficient, Petitioner still fails to show prejudice because the other incriminating evidence—including other transcribed portions of the audio recordings, the authenticity and accuracy of which Petitioner has not challenged—and the Government's promises in exchange for his plea were independently sufficient to motivate Petitioner's plea and sustain his conviction.  Doc. No. 9 at 19-20, 22.

### **Evidentiary Hearing of March 15, 2023**

On November 9, 2022, the Court granted Petitioner's motion for an evidentiary hearing in relation to his § 2255 motion.  Doc. No. 16.  An evidentiary hearing was held on March 15, 2023.  Petitioner testified in support of his motion, and Respondent called

Special Agent Stacey Jordan, Attorney John Rogers and Attorney David Mueller.[13]

Petitioner testified that a couple weeks after he was indicted, he reviewed the Moriarty Transcript very carefully in the office of his attorney, John Rogers.  Doc. No. 30 at 13.  He testified that he did not listen to the recording because he trusted the government's transcript.  *Id.* at 16-17.  Petitioner testified that Dr. Vaid[14] was a prominent prescribing physician in St. Louis who would send blood and urine samples to the lab to be tested and that he understood that paying Dr. Vaid to send his samples to their lab would be a kickback.  *Id.* at 14.  Petitioner testified that his guilty plea was based solely upon the Moriarty transcript section in question, as it was "the only discovery against [him] on [his] case," and if that sentence had not referenced "Dr. Vade," he would not have pleaded guilty.  *Id.* at 15.

Special Agent Stacey Jordan testified, consistent with her affidavit, that she listened to the audio recording and compared it to the Moriarty Transcript and made alterations accordingly.  *Id.* at 168; *see* Doc. No. 9-1, Jordan Aff., ¶¶ 10-11.  She testified that she was able to discern from the audio that the speaker, Camillo, said "Dr. Bond", not "Dr. Vade" in the challenged section, and made that alteration in the Jordan Transcript.  Doc. No. 30 at 169.  She testified that the top of every page of the Jordan Transcript was marked with the following heading: "TRANSCRIPTION CAMILLO

---

[13]     At the parties' request, the hearing was conducted as a joint hearing on both of Petitioner's § 2255 motions, and other witnesses were called by both parties in connection with the § 2255 motion in the tax fraud case.

[14]     Spelled "Vade" in the Moriarty Transcript.

AUDIO – SA JORDAN ADDITION TO MORIARITY" (sic).  *Id.* at 168.  Special Agent

Jordan testified that in July of 2017, a disc containing "all discovery" was provided to

Petitioner's plea counsel, *id.* at 172, and clarifies in her affidavit that this disc included

audio recordings and both the Moriarty and her own transcript.  Doc. No. 9-1, ¶ 12.  The

Respondent supported this testimony with numerous exhibits of the emails between

Special Agent Jordan, the Government, and defense counsel.

Attorney Rogers testified to meeting with Petitioner once or twice a week for

approximately two years during the course of his representation of Petitioner in the health

care fraud case.  Doc. No. 30 at 148.  During these meetings, Petitioner and Attorney

Rogers reviewed the Government's discovery against Petitioner, *id.* at 149, inclusive of a

transcript of the audio recorded conversation in question, *id.* at 150, however he has no

specific recollection of whether he did or did not discuss with Petitioner "any corrected

transcript" disclosed by the Government.  *Id.* at 158.  He further testified that all of the

discovery was made available to Petitioner to review, and that Petitioner never asked to

listen to the audio recordings.  *Id.* at 151.

Attorney Mueller testified predominantly to the transcript he reviewed in

comparison to the audio, without specifying whether it was prepared by Moriarty or

Special Agent Jordan, though by his review he determined it was largely accurate, noting

"some discrepancies . . . none of which [he] thought were substantive."  *Id.* at 161-62.

He testified to having no recollection of the discrepancies with any particularity.  *Id.* at

165.  Attorney Mueller testified to meetings during which he and Petitioner discussed

these discrepancies, as well as the audio and transcript generally.  *Id.* at 163.  He further

testified that Petitioner was offered the opportunity to listen to the recordings.  *Id.*

Additional testimony with be discussed further with respect to the parties' specific

arguments.

## **DISCUSSION**

Pursuant to 28 U.S.C. § 2255, a defendant in federal custody may seek relief from

a sentence imposed against him on the ground that "the sentence was imposed in

violation of the Constitution or law of the United States, or that the court was without

jurisdiction to impose such sentence, or that the sentence was in excess of the maximum

authorized by law, or is otherwise subject to collateral attack."  Section 2255 provides a

statutory avenue by which to remedy constitutional or jurisdictional errors, or errors of

law rising to the level of "a fundamental defect which inherently results in a complete

miscarriage of justice."  *Hill v. United States*, 368 U.S. 424, 428 (1962).  Accordingly,

Petitioner's claims of prosecutorial misconduct and ineffective assistance of counsel are

appropriately raised under § 2255.

It is well established that a guilty plea that is not entered knowingly and

voluntarily is procured in violation of the Due Process Clause, rendering such plea void

and fit for collateral attack.  *See id.* at 104; *Brady v. United States*, 397 U.S. 742, 755

(1970); *Machibroda v. United States*, 368 U.S. 487, 493 (1962).  "By the same token, a

prisoner can collaterally attack his sentence on the ground that his guilty plea was not

knowing or voluntary if his claim is based on evidence not available to him at the time of

the plea," *Ferrara v. United States*, 456 F.3d 278, 289 (1st Cir. 2006); *see Machibroda*,

368 U.S. at 493; *Waley v. Johnston*, 316 U.S. 101, 104 (1942), or if his plea was "induced by threats . . ., misrepresentation . . ., or perhaps by promises that are by their nature improper." *Brady*, 397 U.S. at 755.

Furthermore, Petitioner satisfies the "custody" requirement of § 2255 despite completing his concurrent prison sentences on January 14, 2022, as he subsequently began and still serves his three-year term of supervised release. "If a petitioner, though released from custody, faces sufficient repercussions from his allegedly unlawful punishment," inclusive of supervised release conditions, "the case is not moot." *Leonard v. Nix*, 55 F.3d 370, 372-73 (8th Cir. 1995). Even after release, any collateral consequences are presumed to flow from the criminal conviction. *Id.* at 373; *see O'Neil v. United States*, 966 F.3d 764, 777 (8th Cir. 2020) ("[Petitioner's]  ineffective-assistance-of-counsel claims . . . turn on the validity of his conviction, not the validity of his sentence. Therefore, we presume that those claims bore collateral consequence and are not mooted by his release.").

**<u>Ineffective Assistance of Counsel</u>**

"A defendant 'faces a heavy burden' to establish ineffective assistance of counsel pursuant to section 2255." *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (quoting *United States v. Apfel*, 97 F.3d 1074 (8th Cir. 1996)). The two-part test of *Strickland v. Washington* applies to collateral challenges to guilty pleas on this basis. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). "To establish ineffective assistance during plea negotiations, the petitioner must show 'counsel's representation fell below an objective standard of reasonableness' and 'that such deficient performance prejudiced' the

defense." *Davis v. United States*, 858 F.3d 529, 532 (8th Cir. 2017) (quoting *Strickland*, 466 U.S. 668, 688 (1984)).  "If the petitioner makes an insufficient showing on one component, the court need not address both components." *Kingsberry v. United States*, 202 F.3d 1030, 1032 (8th Cir. 2000).

First, a petitioner "must identify the acts or omissions of counsel" he specifically alleges to be unreasonable, *Strickland*, 466 U.S. at 690, and must prove "that counsel's representation was not within the range of sound defense strategy." *United States v. Sera*, 267 F.3d 872, 874 (8th Cir. 2001).  To limit the distortion of hindsight, courts must "evaluate the conduct from counsel's perspective at the time," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." *Strickland*, 466 U.S. at 689.  Where counsel's allegedly deficient assistance relates to strategic choices or recommendations "made after less than complete investigation," such strategies "are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation." *Id.* at 690-91. Furthermore, where a claim of counsel's deficient performance pertains to information counsel failed to provide a defendant prior to pleading, the fact that defendant did not request the information lends weight in support of counsel's reasonableness. *See Buchheit v. Norris*, 459 F.3d 849, 853 (8th Cir. 2006).

Second, a petitioner must establish prejudice.  Demonstrating prejudice as a result of counsel's deficient performance in this context requires a petitioner show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474 U.S. at 59.  A "reasonable

probability" requires Petitioner demonstrate "a 'substantial,' not just 'conceivable,' likelihood of a different result." *United States v. Frausto*, 754 F.3d 640, 643 (8th Cir. 2014) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)).  As such, "*post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies" will not alone support upsetting a plea.  *Meza-Lopez v. United States*, No. 929 F.3d 1041, 1045 (8th Cir. 2019) (citing *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017)). Also relevant to assessing the strength of the Government's case in support of Petitioner's conspiracy conviction is *United States v. Mohamed*, providing that once the Government has proven a defendant "knowingly joined the conspiracy, the overt act need not be shown to have been committed by him" if it can instead be shown to have been committed by another co-conspirator.  600 F.3d 1000, 1007 (8th Cir. 2010). Additionally, "[Petitioner's] representations during the plea-taking carry a strong presumption of verity and pose a 'formidable barrier in any subsequent collateral proceedings.'" *Nguyen v. United States*, 114 F.3d 699, 703 (8th Cir. 1997) (quoting *Blackledge*, 431 U.S. at 73-74).

When "the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence," the inquiry of whether the alleged error prejudiced Petitioner by causing him to plead "will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Lockhart*, 474 U.S. at 59.  "This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial."  *Id.* Accordingly, it is appropriate that courts consider the strength of the prosecution's case

as circumstantial evidence relating to whether Petitioner would have insisted on going to

trial. *Witherspoon v. Purkett*, 210 F.3d 901, 903-04 (8th Cir. 2000).

**Claim 1: Plea Counsel's Failure to Detect the Transcript-Audio Discrepancy**

<u>Deficient Performance – Failure to Detect Transcript Error</u>

Special Agent Jordan's testimony and the Government's exhibits in support show

that plea counsel was in fact provided with the Moriarty Transcript and Jordan Transcript

along with the rest of discovery prior to Petitioner's plea.  In her affidavit, Special Agent

Jordan asserts she prepared the Jordan Transcript beginning on April 11, 2017.  Doc. No.

9-1, ¶¶ 10-11.  She testified that by email (Government's Ex. 8), on July 17, 2017, she

informed Petitioner's plea counsel, Attorneys Rogers and Mueller, that they would

shortly receive a disc which contained "all discovery," and provided counsel the

password to access the files.  Doc. No. 30 at 172.  In her affidavit, Special Agent Jordan

clarifies the disc's discovery included the original Moriarty Transcript, the Jordan

Transcript, and the audio recordings.  Doc. No. 9-1, ¶ 12.  In the email dated July 12,

2018 (Government's Ex.10), more than two months before the plea, Special Agent Jordan

again provided plea counsel with the audio recordings and the Jordan Transcript, bates-

stamped CAMILLO 0000667.  Doc. No. 30 at 171.  Thus, the audio recordings in

question and correct transcript were emailed by Special Agent Jordan to plea counsel in

2017, and again on July 12, 2018, two months prior to Petitioner's plea hearing.

The testimony of both of Petitioner's attorneys confirms that Attorney Mueller

personally listened to the audio in comparison with at least one transcript, evaluating its

accuracy and making note of any discrepancies, and that Attorney Rogers also reviewed

at least one transcript, and that both attorneys had ample time to discuss their findings

with Petitioner prior to his plea.  *Id.* at 150, 161-62.

At issue is whether, despite this review, plea counsel's failure to detect the

difference between "Dr. Bond," as audible, and "Dr. Vade," as transcribed in a single line

of a 60-page transcript, constitutes more than a mistake, and instead represents a

departure from the reasonable professional assistance to which Petitioner was

constitutionally entitled.  That a professional court reporter employed by Moriarty

Reporting & Video, LLC, made the error upon listening to the audio suggests it does not.

Further, there is no evidence that counsel was relying on the inaccurate transcript.

Attorney Mueller listened to the tape, and Petitioner, in his affidavit, states that "Bond"

can clearly be heard in the audio.  And while Petitioner now accords great weight to that

single sentence, a review of the entire transcript suggests otherwise, as it is replete with

other inculpatory statements regarding payments to doctors.

Plea counsel's recommendation to plead guilty after a review of the Government's

evidence and consideration of applicable defense strategies was objectively reasonable.

Plea counsel's investigation was not constitutionally deficient, even if one assumes that a

single discrepancy in the transcript was missed.  Even a cursory review of the entire

transcript of the recording reveals inculpatory evidence independent of the challenged

portion that supports the reasonableness of counsel's recommendation.  Accordingly, plea

counsel's failure to detect the complained of discrepancy did not amount to objectively

unreasonable conduct.

<u>Prejudice to Petitioner – Transcript Error</u>

In any event, Petitioner is unable to establish that he was prejudiced by this alleged error.  On this record, Petitioner has not shown that he would not have pleaded guilty but for this error in the transcript.  Nor has he shown any likelihood that discovery of the error would have caused counsel to change their recommendation.  Even assuming that Petitioner was only provided the Moriarty Transcript prior to his plea, Petitioner rests his claim of prejudice on the misleading effect of a single line therein.  Having an opportunity to hear and evaluate Petitioner's testimony, the Court does not find his testimony to be believable, and simply does not find credible Petitioner's contention that he would not have pleaded guilty but for the incorrect reference in the Moriarty Transcript.

Further, the record does not support Petitioner's assertion.  In the context of the discussion transcribed, the substitution of "Dr. Vade" for "Dr. Bond" in the challenged line is not entirely understandable, and as such it fails to be as patently inculpatory on its face as Petitioner contends.  At that portion of the recording, the parties were discussing possibly closing the lab and the expenses they would still have if they did so.  Trying to understand why Petitioner ascribed such significance to that statement, the Court questioned Petitioner toward this end at the evidentiary hearing.

> THE COURT: And in that statement, it's talking about closing the lab; right? And what expenses would still have to be paid if you closed the lab?
>
> PETITIONER: Yes. Yes, Your Honor.
>
> THE COURT: All right. And it says you would still have to pay rent; right?

PETITIONER: Yes, Your Honor.

THE COURT: And if you closed the lab, why would payments still need to be made to Dr. Vaid? If you close the lab and he is not sending specimens to the lab, why would payments still need to be made to Dr. Vaid?

. . .

THE COURT: You still have to pay rent. And why would you still have to pay Dr. Vaid?

PETITIONER: I – I don't know.

Doc. No. 30 at 68-69.

Moreover, whatever the misleading effect of substituting "Dr.Vade" for "Dr. Bond" in that specific paragraph, it is far outweighed by the prosecution's body of inculpatory evidence and Petitioner's additional motivations to plead, failing to support a finding that Petitioner would have otherwise proceeded to trial.

Among the other inculpatory evidence was the Government's Section 404(b) evidence, which Petitioner stipulated to in his Supplemental Sentencing Memorandum, and which the prosecution gave notice of its plan to use at trial.  This demonstrates Petitioner's knowledge of illegal kickbacks, and intent by Petitioner to pay illegal kickbacks to doctors and marketers in connection with Petitioner's other pharmacy and lab.  More significantly, numerous unchallenged portions of the Moriarty Transcript, Petitioner's Exhibit A, some of which Petitioner actively participated in, constitute compelling evidence for the prosecution's health care conspiracy case, even disregarding entirely the challenged reference to "Dr. Vade."  Several such excerpts merit recitation here.

SPEAKER 1 (Camillo): You know, [Dr.] Golding moved and just everything shut down. He was a big supplier. . . . the guy can generate work.

Doc. No. 1-2 at 27.

SPEAKER 1 (Camillo): . . . we're also paying commissions on specimens that we're not collecting on, so the whole fundamental thing is bad. . . . I told Kazi [Kazim Meo]. I said when you guys deal with him, let's get away from paying on every specimen and let's just pay on the specimens we actually get or that we collect on.

SPEAKER 3 (Petitioner): Isn't that is the understanding that any – like, yeah, I mean, if – how can we pay on the 10 which we don't collect? You have a point.

Doc. No. 1-2 at 28-29.

SPEAKER 1 (Camillo): . . . That comes down to about $10 a specimen. So now we're at $120 and then we still have to pay commission to the guy who brought it to you, $40. You're actually in the hole by the time you two guys get done with your specimens.

Doc. No. 1-2 at 30.

SPEAKER 3 (Petitioner): I think Tony [Camillo] does have a point here. So we are getting commission. We are giving out commission on the things which we are not getting paid isn't correct.

SPEAKER 4 (Kazim Meo): (inaudible) It's always per specimen.

Doc. No. 1-2 at 32.

SPEAKER 2 (Azeem Meo): . . . you get $100 for Medicare, okay, you don't get anything.

SPEAKER 1 (Camillo): Who doesn't get anything?

SPEAKER 2 (Azeem Meo): We don't get anything for a year or so. . . . I'm not getting anything today okay, while I'm spending money, okay. Plus I pay him, what, $40, okay. I pay him $40.

SPEAKER 1 (Camillo): 35 actually.

SPEAKER 2 (Azeem Meo): Thirty-five. Plus I'm spending – let's say I'm spending 35, $40. . . . I'm paying him $80 on two. I'm spending $80 on two,

getting $100 back.

Doc. No. 1-2 at 45-46. These among other portions of the Moriarty Transcript reflect Petitioner's participation in a conversation with co-conspirators regarding "commission" payments for the referrals of specimens to Allegiance. They indicate Petitioner was aware that Allegiance's business entailed the payment of such kickbacks, consistent with Petitioner's own representations under oath at his plea hearing. Crim. Doc. No. 1001 at 34. These excerpts stand independent of the erroneous reference to "Dr. Vade," such that correcting the one reference to "Dr. Bond," to whom payments were presumably legal, would not render the recording exculpatory.

Had Petitioner proceeded to trial, the Government almost certainly would have put these and other portions of the transcript or recorded audio before a jury to establish Petitioner knowingly joined the conspiracy. Upon doing so, per *Mohamed*, evidence of any number of overt acts by Petitioner's co-conspirators pertaining to the operation of Allegiance or solicitation or payment of kickbacks to either doctors or marketers, much of which Petitioner stipulates to in his plea agreement, would have met the requisite elements of the Government's case. 600 F.3d at 1007. Further, co-defendant Camillo, who made the tape at issue, had pleaded guilty and was prepared to testify against Petitioner. Petitioner had been provided copies of Camillo's statements to the investigators. Indeed, Camillo testified in the trial that proceeded against co-defendant Golding, in which Golding was convicted.

Nor is there anything in the record that impeaches Petitioner's plea or tends to indicate that his representations under oath were anything but the truth. And at the plea

he admitted unequivocally to being aware that Allegiance was involved in the solicitation and receipt of payment for illegal kickbacks.  The Court finds unbelievable Petitioner's assertion that he based that admission solely on that single line in the Moriarty Transcript.

In addition, Petitioner ignores a wholly independent basis for his liability under Count I, to which he freely admitted.  Petitioner admitted to knowingly and actively assisting Azeem Meo's illegal involvement in Allegiance, which was illegally concealed, evidence of which was not dependent on the recorded conversation.  Indeed, the transcript, even if corrected to reference Dr. Bond, strongly evidences Azeem Meo's involvement in Allegiance and Petitioner's knowledge of such.

Inculpatory evidence aside, the parties' plea agreement sets out a number of motivations which also reasonably undermine Petitioner's assertion that but for the error within the transcript, he would have insisted on going to trial.  Petitioner's plea to Count 1 of the health care fraud case cannot be viewed in isolation.  In exchange for his plea, the Government moved for the dismissal of Counts 3-6 of the indictment, promised to pursue no further prosecution of similar conduct related to Petitioner's other businesses, and recommended a two-level reduction in Petitioner's offense level and the consolidation of his cases at sentencing, all greatly reducing the potential term(s) of incarceration Petitioner would have risked by proceeding to trial.  Petitioner further stipulated that the Sentencing Guidelines analysis agreed to by the Government, namely a recommended total offense level of 16, "led, in part, to the guilty plea."  Crim. Doc. No. 429 at 2, 13.

Thus, in light of Petitioner's representations at his plea hearing and the weight of the totality of the Government's evidence, there is not a substantial likelihood that, had plea counsel detected the transcript discrepancy, Petitioner would have insisted on proceeding to trial.  In fact, the transcript error is *de minimis* compared to the wealth of other evidence against Petitioner, including the unchallenged excerpts of the Moriarty Transcript, the unchallenged evidence with respect to concealment of Azeem Meo's involvement, the availability of Camillo to testify, and the other evidence supporting Petitioner's admissions under oath at the plea colloquy.

Nor has Petitioner established that the transcription error, even if detected, would have impacted defense counsel's advice to Petitioner.  Prior to the plea, defense counsel was aware not only of all of the other evidence related to the health care fraud case, including the other portions of the tape which discuss kick-backs and Petitioner's knowing concealment of Azeem Meo's involvement, but was also aware of the tax fraud investigation and a third investigation the government was conducting with respect to an illegal marketing and kick-back scheme related to a different company of Petitioner's, St. Louis Hills Pharmacy.  And counsel shared this information with Petitioner.  Doc. No. 30, at 152 – 153.  Attorney Rogers testified that prior to Petitioner's plea and after investigation, he provided Petitioner his professional opinion that he could "present a very legitimate defense to try to convince a jury that he was not involved in the health care fraud scheme."  Doc. No. 30 at 155.

However, Attorney Rogers explained that they had looked at the loans Petitioner made from St. Louis Hills to family and friends, and personal expenses he made or didn't

make, and determined that if the government delved into the tax case to the extent they believed it would, Petitioner would have had three times the exposure under the Federal Sentencing Guidelines.  Thus, any exposure Petitioner had under the health care fraud case would be coupled with the potential exposure under the tax fraud case.  Attorney Rogers explained that it made little sense to try multiple cases when there was a strong likelihood of conviction on the tax case.  *Id.* at 154.

Attorney Rogers testified that Petitioner inquired into the possibility of pleading guilty to solely the tax fraud case, however the Government "mandated a health care fraud conviction or [the Government] would not consolidate the cases and agree not to pursue the St. Louis Hill Pharmacy case."  *Id.* at 155-56.  It is clear from counsel's testimony and the record that Petitioner's exposure on the tax case and on other yet uncharged conduct related to St. Louis Hills Pharmacy was critical to counsel's advice to Petitioner; not the one sentence regarding "Dr. Bond" in the recorded conversation.

At the evidentiary hearing, Petitioner himself testified that he "was given [the] offer that four charges would be dropped in the health care [case]. … I just wanted to, basically, lessen my sentence.  Instead of five charges, I will only plead guilty to the one."  *Id.* at 15.  The Court finds that the strength of the other evidence against Petitioner on the health care fraud case, his exposure to other health care and tax fraud charges related to his other businesses, the strength of the tax fraud case, and the prosecuting and sentencing concessions made by the Government pursuant to the parties' plea agreement

are what motivated counsel's advice to Petitioner and Petitioner's plea.  Petitioner's

decision to plead guilty did not hinge on a single transcript error.[15]

## Claim 2: Counsel Failed to Afford Petitioner the Opportunity to Review the Audio

### Deficient Performance – Access to Recording

Petitioner also asserts that he was not given the opportunity to review the audio of

the conversation.  There is no support in the record for this contention, consistent with

their affidavits, Attorneys Rogers and Mueller's testimony support the finding that that

Petitioner was never denied access to anything in discovery by his counsel.  Attorney

Rogers testified that he met with Petitioner once or twice a week for two years;

"whatever [Petitioner] requested that he wanted to go over and review, he certainly had

enough time to do it with all the time that [Petitioner and Rogers] spent together over this

---

[15]     The timing of Petitioner's discovery of the transcript error is, curiously, unclear.
Petitioner says Azeem Meo advised him of it after Azeem Meo was released from prison,
but that appears to have occurred in August, 2018.  Doc. No. 1-2, Pet'r's Aff., at ¶ 22;
Federal Bureau of Prisons, Find an Inmate, https://www.bop.gov/inmateloc/ (follow
"Find by Name"; then search "Azeem Meo").

     When cross-examined as to why Petitioner never raised the issue of an allegedly
intentionally altered transcript with the Court at his sentencing hearing, Petitioner
testified at the evidentiary hearing that despite his colloquy, he did not know he could
address the Court directly on the matter, and that he understood his sentencing counsel,
David Helfrey, would have to do so on his behalf.  Doc. No. 30 at 47.  Petitioner
further testified that he did raise the issue with Mr. Helfrey, and that Mr. Helfrey did in fact
inform the Court that Petitioner wished to withdraw his plea.  *Id.*  The Court has no
recollection of these assertions, and the record to date bears no support for them;
Petitioner's numerous pre-sentencing motions and habeas briefs are silent on the matter.
To the contrary, in Petitioner's Motion for Downward Variance at Sentencing, Petitioner
affirmed "[b]y entering into the written plea agreement, [Petitioner] admitted he
knowingly committed these offenses and is in fact guilty of these offenses."  Crim. Doc.
No. 774 ¶ 2.  Indeed, the testimony appears inconsistent with the statements in his
affidavit that he only first heard the audio of the tape, on January 31, 2020, shortly before
he filed his § 2255 motion.

two-year period."  Doc. No. 30 at 151.  Attorney Rogers further affirmed that Petitioner never requested to listen to the audio, but that "all the discovery was available to – was discussed and shared with [Petitioner]."  *Id.*  Attorney Mueller testified to being unaware if Petitioner ever listened to the audio or requested to do so, but believed that plea counsel "made that offer."  *Id.* at 163.

Importantly, Petitioner does not contend that he *asked* his attorney to make the audio recording available to him and that they failed to comply, or that his counsel otherwise failed to perform any tasks requested of them.  To the contrary, Petitioner affirmed at his plea hearing there was nothing he asked his attorney to do, and nothing he believed his counsel should have done, that counsel had failed to do.  Crim. Doc. No. 1001 at 17.  Applying the court's rationale in *Buchheit*, Petitioner's failure to request the materials from his attorneys supports the finding that his counsel's performance was reasonable.  459 F.3d at 853.  Furthermore, plea counsel affirmed that they reviewed the transcript and the potential discrepancies they had flagged with Petitioner.  In light of the strong presumption in favor of counsel's reasonableness, the fact Petitioner never requested the audio recording, despite knowing of its existence, and because Petitioner expressed no grievance over the same during his plea colloquy or at or before his sentencing, the Court finds no factual basis for Petitioner's claim of deficient performance by counsel.

Prejudice to Petitioner

Nor is there a substantial likelihood that had Petitioner been given access to the audio recording prior to his plea, he would have insisted on going to trial.  The factors

detailed above that undoubtedly led Petitioner to plead guilty—independent of the substitution of a doctor's name within one line of an otherwise highly inculpatory transcript—remain the same.  For the reasons the Court finds against prejudice under his first claim of ineffective assistance of counsel, the Court finds Petitioner was not prejudiced by his plea counsel's failure to provide the audio recording in advance of his plea.

**Prosecutorial Misconduct**

As previously discussed, Petitioner has conceded his claim of prosecutorial misconduct.  In any event, Petitioner's claim fails.  A two-part test governs such claims, requiring Petitioner demonstrate "first, the prosecutor's conduct . . . must have been improper, and second, the . . . conduct must have prejudicially affected the defendant's substantial rights by depriving the defendant" of due process.  *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001).  Here, Plaintiff can establish neither misconduct nor prejudice.

Special Agent Jordan's testimony at the evidentiary hearing, consistent with her affidavit, supports the finding that at no point did she intentionally and wrongfully falsify any transcript.  Her testimony that she reviewed the Moriarty Transcript to ensure its accuracy and subsequently corrected any discrepancies by way of the Jordan Transcript is consistent with the demands of due process.  Also, as discussed at length above, Petitioner cannot establish that he was prejudiced by the initial transcript error.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner Rehan Rana's motion filed under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence is **DENIED**.

**IT IS FURTHER ORDERED** that this Court will not issue a Certificate of Appealability as Petitioner has not made a substantial showing of the denial of a federal constitutional right as required by 28 U.S.C. § 2253(c)(2).

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of  March, 2023.